**GEORGE R. HALL, INC. and Federal Insurance Company, Plaintiffs,**

v.

**SUPERIOR TRUCKING COMPANY, INC., Sims Crane Service, Inc. and Howard Baer, Inc., Defendants.**

**Civ. A. No. C79–797A.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Feb. 26, 1982.

---

Howell Hollis, III, Freeman & Hawkins, Atlanta, Ga., for plaintiffs.

John D. Sours, Wasson, Sours & Harris, Atlanta, Ga., J. Robert Persons & Stephen E. O'Day, E. Clayton Scofield, III, Hurt,

Richardson, Garner, Todd & Cadenhead, Robert E. Corry, Jr., Dennis, Corry, Webb, Carlock & Williams, Atlanta, Ga., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

Now before the court are several motions by each party, raising a total of eleven separate requests for post-trial relief. The essential facts underlying the trial of this case can be briefly stated.

### I. *Facts*

George R. Hall, Inc. ("Hall"), hired Superior Trucking Co., Inc. ("Superior") to haul a large and complex newspaper printing press from New York to Louisiana. While in route to Louisiana, the Superior truck carrying the press was involved in a collision near Atlanta, with a truck owned by Howard Baer, Inc. ("Baer"). The collision necessitated a transfer of the press to a different Superior truck. Sims Crane Service, Inc. ("Sims") was called by Superior to lift the press from the damaged Superior truck to the relief truck. During this operation, the press fell and was damaged.

Hall and its insurer, Federal Insurance Company ("Federal"), sued Superior, Sims and Baer. Each defendant filed cross-claims against its co-defendants relating to the allocation of damages in the event liability was established. The defendants' various cross-claims dealt with matters of law, and might have been rendered moot, depending on whether, and how, liability would be assessed.

Because of the contingent nature of the cross-claims, it was agreed among counsel and the court that the cross-claims would be ruled on by the court, after trial, conditional on a finding of liability and subject to the evidence presented during trial.

On September 15, 1981, after a six day jury trial, a verdict was returned in favor of plaintiffs Hall and Federal, and against defendants Superior and Sims. The jury found that the negligence of both Superior and Sims was the cause of damage to the press, and awarded damages in the sum of $118,666.36, for which Superior and Sims were jointly and severally liable. Defendant Baer was found not to have been negligent.

On September 18, 1981, this court entered a partial final judgment against Superior and Sims, jointly and severally, in the amount of $118,666.36 plus interest and costs. In accord with Superior's bill of lading, Superior's liability was reduced to $112,500.

Now pending are the following motions: Superior's motions to reduce costs, and for judgment on its cross-claim for contribution against Sims; Sims' motions for judgment notwithstanding the verdict, a new trial, to reduce costs, and for judgment on its cross-claim asserting defenses of release and indemnity and denying Sims' motions for contribution; and Hall's motions to proceed with the assessment of interest, attorney's fees and punitive damages.

### II. *Defendants' Cross-Claims*

Under Georgia law there exists a right of contribution among joint tortfeasors, each for their *pro rata* share of a judgment. Ga.Code Ann. § 105–2012 (Supp.1981); Ga. Code Ann. § 37–303 (1979). Based on these provisions, Superior has moved for entry of judgment against Sims in the amount of $56,250, half of Superior's liability.

Sims agrees there is a right to contribution among joint tortfeasors. However, Sims denies that Superior is entitled to contribution in this case. Sims insists that Superior signed a release of its claims against Sims. Sims further contends that Superior agreed to indemnify Sims for any sums which Sims may be required to pay the plaintiffs against satisfaction of the judgment.

Sims bases its claims of a release and indemnity agreement on paragraph 5 of a document referred to by the parties as a "work order". That paragraph states:

PARAGRAPH 5. COMPANY MAKES NO WARRANTIES TO CUSTOMERS, EXPRESS OR IMPLIED EXCEPT AS

SPECIFICALLY SET FORTH HEREIN. COMPANY SHALL NOT BE LIABLE TO CUSTOMER OR TO ANYONE ELSE FOR ANY LOSS OR DAMAGE OF ANY KIND WHATSOEVER, WHETHER CAUSED BY THE EQUIPMENT OR BY THE OPERATION, MAINTENANCE OR REPAIR THEREOF, OR BY ANY FAILURE THEREOF OR INTERRUPTION OF SERVICE OR DELAY CAUSED THEREBY. IT IS AGREED THAT THE RENTAL RATE SET FORTH IN PARAGRAPH 7 HAS BEEN SET IN CONSIDERATION OF THE COMPANY NOT BEING LIABLE TO CUSTOMER EVEN THOUGH A LOSS, DAMAGE OR DELAY MAY BE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF COMPANY OR ITS SERVANTS, AGENTS OR EMPLOYEES.

Even though the work order was not signed until after Sims had supplied crane service, Sims maintains that the work order sets forth the terms of the agreement under which service was supplied and Superior was billed.

In response, Superior argues that Sims failed to raise the issue of release before or during trial and is barred from doing so now; that if this issue can be raised now the work order cannot be construed as an agreement to release or indemnify; that if the agreement can be so construed, the agreement must fail for want of consideration; and that even if the release and indemnification agreement is valid, it cannot be enforced because it was procured by fraud.[1]

## A. Release

1. Failure to raise affirmative defense of relief.

▇ Rule 8(c) of the Federal Rules of Civil Procedure requires that "In pleading to a preceding pleading a party shall set forth affirmatively ... release ... and any other matter constituting an avoidance or affirmative defense." Generally, a failure to plead an affirmative defense results in a waiver of that defense and its exclusion from the case. *Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 298 at n.1, (5th Cir. 1979); 5 Wright & Miller, Federal Practice and Procedure: Civil § 1278 (1969).

Superior maintains that at no time during this litigation until the filing of post-trial briefs, did Sims raise the affirmative defense of release. Sims made five pre-trial filings relevant to the question of its waiver of affirmative defenses: its answer to plaintiffs' complaint; its cross-claims; its answer to Superior's cross-claims; the pre-trial order; and its trial brief. An examination of these filings reveals no claim of release.

Sims relies on its answer to Superior's cross-claim. But this merely states "that Defendant Superior, at the outset of the undertaking, contractually disclaimed and absolved Defendant Sims ... from any liability." This coincides with the theory set forth in Sims' own cross-claim that "... at the time of occurrence of the damage ... Sims was party to a written agreement ... with Superior."

The notice this pleading provides is that Sims would argue a contract for provision of crane services was signed or verbally consented to prior to the damage of the press, and that one term of this contract was a covenant not to sue. Post-accident release, which is a separate and distinct theory, see *Cash v. Street & Trail Inc.*, 136 Ga.App. 462, 221 S.E.2d 640 (1975), is nowhere mentioned or hinted at. By contrast, other issues raised by Sims are brought forth clearly and forcefully. For example, Sims' contention that paragraph 5 serves as an indemnification agreement is specifically alleged.

---

1. Superior's contention that Sims' failure to hand over the work order face up when it was proffered for Superior's assent is insufficient, as a matter of law to show fraud. The work order was clearly labeled "page 1" and "page 2" and the paragraphs were numbered. Superior's representative could have turned the work order over and read it, even while it was in the receipt book. See *Bourne v. Balboa Insurance Co.*, 144 Ga.App. 55, 56, 240 S.E.2d 261 (1977).

Furthermore, the issue of release is not discussed in the court's pre-trial order which purports to be an all-inclusive statement of the issues present for consideration, and which was signed by Sims' attorneys. Sims' trial brief is also devoid of any arguments pertaining to release.

Sims asserts that even if its pleadings did not raise the defense of release, the pleadings should be treated as if the defense were raised in its answer, pursuant to Rule 15(b), Fed.R.Civ.P. Under Rule 15(b), if issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated as if they had been raised by the pleadings.

Sims argues that there was express consent to try the issue of release in the agreement to reserve cross-claims for post-trial decision, and implied consent to try the issue in the uncontested introduction of the work order into evidence.

The burden of proof on a Rule 15 motion to amend the pleadings rests with the movant. Sims has failed to indicate any portions of the trial transcript which would support its claim that release was expressly raised at trial.[2]

Additionally, while under Rule 15, a party's failure at trial to object to evidence relevant to an unpleaded theory gives implied consent to amendment of the pleadings; the introduction of evidence relevant to an issue already in the case may not be used to show consent to a new issue, absent a clear indication that the party who introduced the evidence was attempting to raise a new issue. *International Harvester Credit Corp. v. East Coast Truck and R. V. Sales, Inc.*, 547 F.2d 888, 890 (5th Cir. 1977), *Bettes v. Stonewall Insurance Co.*, 480 F.2d 92 (5th Cir. 1973); 6 Wright & Miller, Federal Practice and Procedure: Civil § 1493 (1971).

The work order and the circumstances of its execution were relevant to Sims' claims of borrowed servant, indemnity and contractual disclaimer. Absent some showing by Sims indicating its intention to raise release as a defense, Superior's failure to object to introduction of the work order cannot be used to imply consent. *See International Harvester*, 547 F.2d at 890.

As a final point, it has been suggested that since the claim of release relates to matters of law, there is no prejudice to Superior if the question of release is decided on the merits. Professor Moore states that the question of prejudice to the defendant plays no role under the first part of Rule 15(b). He writes that the question of prejudice arises only under the second part of Rule 15(b), which deals with the situation where one party has objected to evidence, and that the sole inquiry under the first part is whether there has been express or implied consent. 3 Moore's, Federal Practice ¶ 15.13[2]. Concededly, however, earlier in his treatise Professor Moore states the test under the first part of Rule 15(b) is "whether the defendant would be prejudiced by the implied amendment, i.e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory." *Id.* at 993.

Even if the court applies the liberal absence of prejudice test, however, it does not appear that amendment of the pleadings should be allowed. Lack of notice by Sims that it would raise the issue of release did prejudice Superior. Superior could refute Sims' arguments on borrowed servant doctrine, indemnity and contractual disclaimer without exploring all the issues necessary to refute a claim that it had signed a post-accident release for valid consideration.

In the absence of any meaningful mention of release by Sims, Superior could rely on the absence of release from the case, and could forego any discovery or preparation to meet that defense with the security that any claims of release were precluded.

---

**2.** Apparently, neither defendant ordered a transcript prior to the filing of their briefs on the Rule 15 issues. The court is aware of only one mention of release—during Sims' opening statement. Obviously, if the transcript reveals other references the parties may bring them to the court's attention by filing a timely motion. Rule 59, Fed.R.Civ.P. But see the text at "2. Consideration," *infra*, as to what effect this might have.

## 992

### 2. Consideration.

■ *Arguendo*, even if Sims were able to show that there was implied consent to include the issue of release and that paragraph 5 should be construed as a release, Sims failed to establish that there was any consideration for a release agreement. Under Georgia law, "consideration is essential to a contract which the law will enforce." Ga.Code Ann. § 20–301 (1977); *Jolles v. Wittenberg*, 148 Ga.App. 805, 806, 253 S.E.2d 203 (1979).

Paragraph 5 specifies that "The rental rate set forth in paragraph 7 has been set in consideration of [Sims] not being liable . . ." However, the presence of this recital does not end the inquiry into the existence of a valid consideration for the purported release. First, the court notes that no rental rate is specified in Paragraph 7. That paragraph deals only with the "equipment time" for the length of the rental period. Second, although the language of the work order ("This agreement is entered into . . ."; "company agrees to furnish . . .") indicates that the agreement was written in the expectation that it would be signed *before* Sims' cranes were provided to any customer, all parties concur that the agreement was not actually presented to Superior and signed by representatives of both Sims and Superior until after the accident with the press and the completion of on-site work. Whether this post-job "work order" is binding is thus in question.

The initial work order was made verbally when Superior telephoned Sims requesting a crane to transfer the printing press from the disabled Superior truck. There is some dispute as to the particulars of the conversations between Superior's and Sims' representatives prior to the dispatch of Sims' crane. Whether rental rates were set, or the disclaimer of liability by Sims discussed, is not clear.

However, it is undisputed that after Superior described its requirements, Sims dispatched a crane to the accident scene, and undertook to move the press. Superior contends that the rental rate set by Sims in computing the amounts shown on the written work order were precisely the same rates and amounts Superior was already obligated to pay by the terms of its verbal contract. Superior therefore concludes that there was no consideration for the post-job inclusion of the terms reflected in paragraph 5.

While ordinarily courts will not examine the adequacy of consideration, *Cash v. Street & Trail Company, Inc.*, 136 Ga.App. 462, 221 S.E.2d 640 (1975); *Ford Motor Credit Co. v. Moulder*, 137 Ga.App. 527, 224 S.E.2d 435 (1976), as already noted, there must be *some* consideration. Where an amount of money is already owing, the promise to pay the same amount of money upon the same terms as it was already owed, cannot constitute consideration for a new agreement. *Holsomback v. Caldwell*, 218 Ga. 393, 128 S.E.2d 47 (1962); *Johnson v. Hinson*, 188 Ga. 639, 4 S.E.2d 561 (1939). *See generally*, 1A Corbin, Contracts §§ 178, *et seq.*, (1963) (preexisting duty rule).

Under the circumstances present here, Superior is free to show that in fact no consideration was paid. *See Herrington v. Herrington*, 70 Ga.App. 768, 29 S.E.2d 516 (1944). *See also, Carlton v. Western & A. R. Co.*, 81 Ga. 531, 7 S.E.2d 623 (1888) (prior contract established terms for plaintiff's work and provided allocation for risk of liability in event of injury; subsequent release of defendant's liability void for lack of consideration).

A contract must be construed against the party that drew it. The written work order, with language indicating it was to be signed before service was provided was in fact signed afterwards, thus creating ambiguities. Because Superior showed that services were provided by Sims, and Superior already owed Sims payment before the purported release was signed, Sims would have to show either (1) that the rates shown on the work order were adjusted down once the release was agreed to, or (2) that a covenant not to sue was a term of the initial, verbal work order. This Sims has failed to do.

Sims' allegation that contribution is barred by a release based on paragraph 5 of

the work order was not timely raised, and cannot stand.

## B. Indemnity

Sims argues that paragraph 5 of the work order serves not only as a release, but as an indemnification agreement as well.

The basis for Sims' claim of indemnity is the language in paragraph 5 that "Company shall not be liable to customer *or to anyone else...*" (emphasis added). The language of this single phrase cannot bear the weight Sims seeks to place upon it.

▮▮▮ Indemnity is defined as "the obligation or duty resting on one person to make good any loss or damage another has incurred or may incur by acting at his request or for his benefit." *Cash v. Street & Trail, Inc.,* 136 Ga.App. at 465, 221 S.E.2d at 642. Parties to a contract may validly agree that one party will indemnify or hold harmless the other party from liability on account of the latter's negligence, provided that the intention of the parties is clear from the terms of the contract and from the situation of the parties at the time the contract was made. *See Binswanger Glass Co. v. Beers Construction Co.,* 141 Ga.App. 715, 234 S.E.2d 363 (1977); *Batson-Cook v. Georgia Marble Setting Co.,* 112 Ga.App. 226, 144 S.E.2d 547 (1965). No particular words or talismanic language is necessary. *See Smith v. Seaboard Coastline Railroad,* 639 F.2d 1235, 1239 (5th Cir. 1981). It is for the court to construe the meaning of an indemnity agreement. *Id.*

The requirement that an indemnity agreement be definite, is *a fortiori* so when a negligent party seeks indemnification for its own negligence:

> In the overwhelming majority of the cases the result reached by [the courts'] interpretational efforts can be condensed into the simple rule that where the parties fail to refer expressly to negligence in their contract such failure evidences the parties' intention not to provide for indemnity for the indemnitee's negligent acts. [cites omitted]. *Batson-Cook Co. v. Georgia Marble Setting Co.,* 112 Ga.App. at 230, 144 S.E.2d at 550.

▮▮▮ The language relied on by Sims is not definitive enough, as a matter of law, to show an intent to hold Superior liable as an indemnitee. Sims argues that Georgia law recognizes that an agreement to indemnify may be express or implied. *Southern Nitrogen Co. v. Stevens Shipping Co.,* 114 Ga.App. 581, 151 S.E.2d 916 (1966). However, Sims has not cited, nor has this court found any cases of an implied duty to indemnify, *ex contractu,* between joint tortfeasors based on language as vague as that here. *See Smith v. Seaboard, supra,* and cases cited therein.

Although the courts will be more willing to find indemnity in favor of a negligent indemnitee when the indemnitor is also negligent, the intent to indemnify must still be clear. *See Smith v. Seaboard Coastline Railroad,* 639 F.2d at 1239; *Georgia State Telephone Co. v. Scarboro,* 148 Ga.App. 390, 391, 251 S.E.2d 309 (1978); *Peacock Construction Co. v. Montgomery Elevator Co.,* 121 Ga.App. 711, 175 S.E.2d 116 (1970).

The conclusion that no indemnity agreement was intended is heightened by the circumstances at the time the contract in this case was signed. The purported indemnity agreement was contained as part of a one page, preprinted, work order receipt taken from a receipt book of the familiar type which contains multiple copies separated by carbon paper. The Sims representative who signed the document on Sims' behalf testified that he himself did not understand the meaning of the agreement.

Finally, an indemnity agreement, like a release, must be supported by consideration. Ga.Code Ann. § 20–301 (1977). The questions as to whether Sims paid any consideration, which were raised in connection with the validity of paragraph 5' as a release, *supra,* are pertinent to the issue of indemnity as well.

Here however, Sims has even a further difficulty, for paragraph 5 does not recite that a rental rate adjustment was made in consideration for the purported indemnity agreement. The agreement provides only that the rental rate was set in consideration

of the company "Not being liable *to customer*" (emphasis added). There is no consideration asserted for the extension of the purported agreement of Sims' non-liability to "anyone else".

Accordingly, Sims' claim for indemnity from Superior cannot stand.

Sims' motion for entry of judgment on its cross-claim is DENIED. Superior's motion for entry of judgment on its cross-claim is GRANTED.

## III. COSTS

Sims and Superior each object to several items in the Bill of Costs which was filed by Hall in accord with Rule 54(d), Fed.R.Civ.P.

### A. Unnecessary Depositions

First, Sims and Superior assert that the depositions of Messrs. Grier, Patton, Johnson, Ryan, Hudder, Hall, Wood and Drake, were unnecessary, and therefore should be excluded from taxable costs.

■ The cost of taking depositions is a taxable Rule 54(d) cost if the depositions were "necessarily obtained for use in the case." 28 U.S.C. § 1920(2). Conversely, costs incurred for the convenience of a party, for the purposes of investigation, or simply to aid a party in a more thorough preparation of the case, are not recoverable. See *U. S. v. Kolesar*, 313 F.2d 835, 837–38 (5th Cir. 1963); *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1323 (5th Cir. 1978). *See generally*, 6 Moore's Federal Practice ¶ 54.77[4].

■ The court's determination as to whether depositions were necessarily obtained for use in a case depends upon a factual evaluation of the case by the district judge in terms of the case's progress in his court. The district court has discretion in determining whether or not a deposition was necessarily taken within the meaning of the statute. *Newman v. A. E. Staley Manufacturing Co.*, 648 F.2d 330, 336 (5th Cir. 1981); *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d at 1324. A deposition not used at the trial is still taxable in favor of the prevailing party if it appeared to be reason-ably necessary to the parties in the light of a particular situation existing *at the time it was taken*. *Electronics Specialty Co. v. International Controls Corp.*, 47 F.R.D. 158, 162 (S.D.N.Y.1969) (emphasis in original).

■ As this court has previously noted "a deposition taken within the proper bounds of discovery ... will normally be deemed to be 'necessarily obtained for use in the case,' and its costs will be taxed unless the opposing party interposes a specific objection that the deposition was improperly taken or unduly prolonged." *Jeffries v. Georgia Residential Finance Authority*, 90 F.R.D. 62 (N.D.Ga.1981).

■ After consideration of disputed issues and facts involved in this case, the sources of potential evidence on these disputed matters, and the direct examination and cross-examination of the witnesses called by both parties, the court concludes that the depositions objected to by Sims and Superior were necessarily obtained for use in the case. The depositions of Messrs. Hall and Drake were noticed by defendants not plaintiffs. Grier, Patton, Johnson and Hudder were eye-witnesses to some aspect of the roadside events. Further, Ryan and Wood as well as Grier, Patton, Drake and Hudder were called as witnesses and their deposition testimony was an effective source of direct and cross-examination material.

The objections to unnecessary depositions are OVERRULED.

### B. Deposition Copies

■ Second, Sims and Superior objected to taxing costs for copies of depositions of certain persons. The courts are split on the proper rule for taxing the costs of copies of depositions taken by an opponent. The Fifth Circuit, however, allows deposition copies to be taxed as costs if the copy was necessarily obtained for use in the case. *United States v. Kolesar*, 313 F.2d 835 (5th Cir. 1963). *See also, SCA Services, Inc. v. Lucky Stores*, 599 F.2d 178, 180 (7th Cir. 1979).

The strongest argument against the taxation of costs incurred for deposition copies is that because the prevailing attorney has access to the deposition in the clerk's office, "the copies [must] be charged off as a *convenience* to counsel. Being nothing more than a mere convenience, the costs may not be taxed." *Kolesar*, 313 F.2d at 838 (emphasis in original). This argument is unconvincing, however, and "there is an abundance of common sense to justify a court allowing the costs of a deposition copy." *Id.* at 839.

*Kolesar's* rationale has recently been strengthened by a local rule change. At the time *Kolesar* was decided the federal rules required the filing of all depositions with the clerk of the court. In 1980, however, the rules were amended to empower the court to dispense with the mandatory filing of every deposition. Rules 5(d), 30(f)(1), Fed.R.Civ.P. This court no longer requires the filing of every deposition. Local Rules 181.23 and 211.1. Thus, access to a copy of a deposition filed in a clerk's office, formerly theoretical at best, is now, at least in the Northern District of Georgia, entirely fictional.

Even were the local rules not as they are, as indeed they were not during a part of the present litigation, the argument against allowing copies of depositions as taxable costs is still weak. *Kolesar*, 313 F.2d at 839.

As a practical matter, the new local rules mean that ordinarily a *Kolesar* type evaluation will always lead to the conclusion that copies of depositions taken by opponents will be taxable costs if the depositions themselves were necessary.[3] Even if depositions taken by opponents are eventually filed with the clerk, a copy made before filing can be a taxable cost since all parties should have equal access to necessary depositions in planning further discovery or pretrial motions.

Copies of depositions taken by the prevailing party present a different matter. The local rules require that if discovery materials are to be used at trial or are necessary to a pre-trial or post-trial motion, the portions to be used shall be filed with the clerk at the outset of the trial or at the filing of the motion insofar as their use can be reasonably anticipated. Since the party taking the deposition is allowed an opportunity to hold on to that deposition, a copy ordered for the party's reference in the event the original is submitted to the court would ordinarily be only for that party's convenience. Although a copy would probably be an aid, the expense of obtaining the copy is more analogous to non-taxable deposition costs—for example travel costs, investigation and attorney's fees—than it is to taxable costs. *Kolesar* itself dealt only with copies of depositions noticed by an opponent. *See also, Jeffries*, 90 F.R.D. at 64. There is no basis for extending *Kolesar* under the circumstances present here.

Accordingly, after consideration of the particular facts involved with the deposition copies at issue here, and in light of the general principles outlined above, the court concludes that the copies of depositions noticed by the defendant were necessary, and hence taxable, costs. However, the copies of depositions noticed by Hall itself, and obtained for its own use are not taxable costs, and should be struck from the Bill of Costs. *See Newman*, 648 F.2d at 336.

The objections of Sims and Superior on this point are GRANTED in part and DENIED in part.

C. Travel Costs

 Third, Sims and Superior object to the taxing of $1,028.20 of attorneys' travel expenses to attend depositions. Absent extraordinary or compelling circumstances, travel of attorneys is not a taxable cost of taking depositions. *See Wahl v. Carrier Manufacturing Co., Inc.*, 511 F.2d 209, 217 (7th Cir. 1975); *Kaiser Industries Corp. v. McLouth Steel Corp.*, 50 F.R.D. 5 (E.D.Mich.1970); 6 Moore's Federal Prac-

---

**3.** In light of the local rule change, post-trial disputes over deposition costs may require the filing of depositions for the *Kolesar* evaluation.

tice ¶ 54.77[4]. *See also, Gerber v. Stoltenberg*, 394 F.2d 179 (5th Cir. 1968). Hall argues that the travel expenses should be allocated to Sims and Superior because these parties refused to stipulate to damages, which necessitated the depositions for which the expenses are claimed.

While stipulations are encouraged where possible, it appears to the court from exhibits attached to briefs on the instant motions that the defendants were unwilling to stipulate only because of a justified question about "deficiencies in the verification of [Hall's] claim." Damages were an element of Hall's case. Sims and Superior were not required to stipulate. The fact that once depositions were taken the defendants were convinced of the validity of Hall's damage claims is not determinative.

The objections of Sims and Superior on this matter are SUSTAINED.

**D. Witness Expenses Above Statutory Witness Fees.**

 Fourth, Sims and Superior have objected to the taxing of deposition fees by witnesses Pascarella, Schkeeper, Wood, Grillo, and Kilpatrick which were in excess of the statutory witness fee. Hall replies that the fees charged by Pascarella, Schkeeper, Grillo and Kilpatrick should be taxed against the defendants because these witnesses' depositions were necessitated only by the refusal of the defendants to stipulate as to damages. As indicated above, the court does not find the defendants' refusal to stipulate to have been improper. Hall has waived the witness fee requested for Wood.

The power of the trial judge to tax witness costs is conferred by 28 U.S.C. § 1920(3); however, the amount of witness fees that may be charged is governed by 28 U.S.C. § 1821. Section 1821 limits the amount of witness fees and makes no provision for the trial court's award in excess of that amount. The plaintiff is not entitled to tax as costs fees of expert witnesses, or other fees in excess of the statutory witness fees. *Goodwin Brothers Leasing, Inc. v. Citizens Bank*, 587 F.2d 730 (5th Cir. 1979). *Baum v. U. S.*, 432 F.2d 85 (5th Cir. 1970).

The witness fees must be reduced by the amount they exceed the statutory maximum. Accordingly, Sims and Superior's objections on this matter are SUSTAINED.

## IV. PREJUDGMENT INTEREST

**A. Claims Against Superior.**

Hall has persistently contended that Superior is liable for prejudgment interest under either the Georgia Unliquidated Damages Interest Act, Ga.Code Ann. § 105–2016 (1981), or the "power of this court to assess attorney's fees (sic) under the Carmack Amendment."

Hall's citations to Georgia law on prejudgment interest and federal law on attorney's fees are irrelevant. Nonetheless, the court concludes, based on its own research, that prejudgment interest can be awarded under the Carmack Amendment and that Hall is entitled to such an award.

 Claims for damaged goods under the Carmack Amendment are governed solely by federal law. *Missouri Pacific Railroad Company v. Elmore and Stahl*, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964); *Hall v. Superior Trucking Co.*, 514 F.Supp. 581 (N.D.Ga.1981). *See generally, Howe v. Allied Van Lines*, 622 F.2d 1147 (3rd Cir. 1980) (history of Carmack Amendment). On this basis, summary judgment on all state law claims in this case was granted to Superior before trial. Accordingly, whether prejudgment interest will be allowed is not controlled by the law of the forum state, and the Georgia Unliquidated Damages Interest Act cannot be the source of any substantive right Hall claims against Superior. *See Louisiana & Arkansas Railroad Co. v. Export Drum Co., Inc.*, 359 F.2d 311 (5th Cir. 1966).

Turning to federal law, it is clear that an award of prejudgment interest may be allowed in the discretion of the trial judge as part of the compensation granted to make whole the injured party in Carmack Amendment cases. The basis for such an award under the federal common law prin-

<br>

**997**

ciples of Carmack Amendment cases is well established in law and policy. *See Nestle Co. v. Consolidated Rail Corp.*, No. 79 Civ. 273 (RWS) (S.D.N.Y. April 22, 1981).

By enacting the Carmack Amendment in 1906, Congress intended to supercede diverse state law with a national uniform policy governing interstate carriers' liability for property to loss or destruction. *See, New York, New Haven & Hartford Railroad Co. v. Nothnagle*, 346 U.S. 128, 131, 73 S.Ct. 986, 988, 97 L.Ed. 1500 (1952). *See generally, Aaacon Auto Transport v. State Farm Mutual Auto Insurance Co.*, 537 F.2d 648 (2nd Cir. 1976). The Amendment states that a carrier shall be liable for the full actual loss, damage or injury to a shipper's property. 49 U.S.C. § 20(11) (1976). The Amendment's terms have been broadly construed to effect its remedial purposes. *See New York, Philadelphia and Norfork Railroad v. Peninsular Produce Exchange*, 240 U.S. 34, 38, 36 S.Ct. 230, 231–32, 60 L.Ed. 511 (1915). *See also Reed v. Aaacon Auto Transport, Inc.*, 637 F.2d 1302 at 1307 (10th Cir.). The Amendment also provides that while setting a uniform standard, it was not intended to diminish any common law remedies shippers had prior to its enactment. 49 U.S.C. § 20(11) (1976). *See Adams Express Co. v. Croninger*, 226 U.S. 491, 33 S.Ct. 148, 57 L.Ed. 314 (1913); *Reed v. Aaacon Auto Transport, Inc.*, 637 F.2d 1302, 1307 (10th Cir. 1981); *Lichten v. Eastern Airlines*, 189 F.2d 939 (2d Cir. 1951) (Frank, J., dissenting).

The right to prejudgment interest was well established at common law, *see Miller v. Robertson*, 226 U.S. 243, 257–58, 45 S.Ct. 73, 78–79, 69 L.Ed. 265 (1924), and prejudgment interest awards have become an integral part of the measure of damages in Carmack Amendment cases. *See Nestle supra; Export Drum, supra.*

The defendants have argued that prejudgment interest in cases of delay or undercharges are not precedent for awards in cases of lost or damaged goods, and that there are no cases awarding prejudgment interest in cases like the one at bar. However, the defendants did not consider *Continental Can Co., Inc. v. Eazor Express, Inc.*, [1964] Fed.Carr.Rep. (CCH) ¶ 81,701 (S.D.N.Y.1964), *aff'd* 354 F.2d 222 (2nd Cir. 1965), a case directly on point with the instant case. In *Continental* the plaintiff shipped a large, heavy and complex machine which slipped off the defendant's truck and was damaged. The court awarded the plaintiff the cost of its repairs plus prejudgment interest on the amount of repairs from the date delivery should have been made. *Accord, Van Zyverden Brothers v. Interstate Refrigerated Transport*, [1966–1967] Fed.Carr.Rep. (CCH) ¶ 81,816 (S.D.N.Y.1967).

The damage measure established in *Continental Can, supra*, accords with the policies underlying Fifth Circuit's analysis in *Export Drum*, 359 F.2d at 317. In that case, which dealt with undercharges, the Fifth Circuit accepted the common law rationale for awarding prejudgment interest, to make whole the plaintiff for money lent, and concluded that this should become the federal standard in Carmack Amendment cases.

The practical logic of the Fifth Circuit's reasoning is more compelling now than when it was first enunciated. During the twenty-five months since the plaintiff's property was damaged interest rates have been sufficiently high to allow the defendants to fund at least a large part of their litigation costs from the earnings on the money owed to Hall. Looking on the other side of the coin, Hall has foregone anticipated earnings on the money it invested in repairs of its press. In such a situation, it is impossible to say that Hall has been made whole if it is merely paid back the cost of its 1979 repairs in inflated 1982 dollars, without any prejudgment interest.

Whether damages were liquidated is one factor for the trial judge to consider in the exercise of his discretion in awarding prejudgment interest, *see Nestle, supra*, and there was some discussion in the parties' briefs as to that question. Although, as stated above, it was not unreasonable for Superior to refuse stipulating to damages before having the information contained in the depositions of Messrs. Hall,

Pascarella, Schkeeper and Brooks, once that information was available there seemed little doubt as to the exact amount of damages. Neither Superior nor Sims seriously contested damages at trial, and the plaintiff would have been entitled to a directed verdict on the question of damages. The damages were sufficiently certain to justify a prejudgment interest award.

Hall's motion for prejudgment interest against Superior is hereby GRANTED. In determining the rate of interest this court will look, as a matter of convenience and practicality, to the interest rate allowed under Georgia law during the applicable time period. The court finds this rate to have been 7 percent until July 1, 1981, and 12 percent thereafter.

Although the federal measure of damages would have allowed a claim for prejudgment interest going to the date on which the press was originally due to be delivered, since Hall has requested less than this amount, the court deems the excess to be waived.

### B. Claims Against Sims

 Hall also seeks prejudgment interest against Sims. Because Hall's substantive claim against Sims did not arise under federal law, Hall's demand for prejudgment interest under the Georgia Unliquidated Damages Interest Act, Ga.Code Ann. § 105–2016, is appropriate.[4]

Sims makes only one objection to application of section 105–2016. It argues that since, under the Georgia law of contribution each joint tortfeasor is liable only for its *pro rata* share of a judgment, the amount Sims might ultimately be required to pay Hall is less than the amount that Hall claimed in its demand letter.

This argument is without any basis in statutory construction and has no founda-

tion in the legislative history or judicial interpretation of the Unliquidated Damages Interest Act. Sims' reasoning would render the Unliquidated Damages Interest Act meaningless in most cases with multiple defendants.

 Sims also objects to the method of calculation of prejudgment interest made by Hall. At the time Hall's demand letter was sent, the applicable interest rate was 7 percent. This rate was raised to 12 percent effective July 1, 1981. 1981 Ga.Laws 681. Hall claims it should have the benefit of the higher rate from its effective date.

The Georgia courts have not yet addressed the question of whether a plaintiff who sent a demand letter under § 105–2016 prior to the effective date of the higher interest rate should have the benefit of the new rate once it took hold. *See Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1324 (5th Cir. 1978) (Texas law). This court's duty in such a situation is to interpret the Georgia statute as would the highest court in Georgia.

If no prejudgment interest, or only too low a rate of prejudgment interest, is recoverable by a successful plaintiff, defendants will always have an incentive to bring cases to trial which would otherwise be settled. One purpose of the Unliquidated Damages Interest Act is to remove a defendant's incentive to draw out a dispute while having the use of contested funds at below market rates. Another purpose is to make successful plaintiffs whole, by compensating them for lost earnings on money "loaned" to defendants. In order for the act to be effective it must allow recovery of interest at a rate close to market rates.

In order to give greatest effect to the Georgia legislature's specification of a higher prejudgment interest rate, prejudgment

---

4. In pertinent part Ga.Code Ann. § 105–2016 states:

105–2016 INTEREST ON UNLIQUIDATED DAMAGES

(a) Where a claimant has given written notice by registered or certified mail to a person of whom claim is made for unliquidated damages in an action *ex delicto*, and the person of

whom such claim is made fails to pay said amount within 30 days from the mailing of said notice, then the claimant shall be entitled to receive interest on the claimed sum if, upon trial of the case in which the claim is made, the judgment is for an amount not less than the sum claimed.

interest at that rate should be immediately available to all plaintiffs whose demand letters were in force at the time of the change. There is no unfair risk in requiring prejudgment interest at the new legal rate since the defendants were free to meet a plaintiff's demand request at any time before final judgment. To rule otherwise, would simply grant defendants an unjustified windfall in clear contravention of the purpose behind the legislature's amendment of the Unliquidated Damages Interest Act.

Hall's demand letter was made in terms of the Act: "If you fail to make such payment ... [Hall] shall be entitled to interest upon said sum ... as is more particularly set out in the ... Act." The interest to which the claimant was entitled under the Act was 7 percent until July 1 and 12 percent thereafter.

Hall's motion for prejudgment interest against Sims is GRANTED at the rate set forth by Hall in its briefs.

Sims and Superior shall be jointly and severally liable for the prejudgment interest claimed by Hall.

## V. ATTORNEY'S FEES

 Hall has moved for attorney's fees against Sims and Superior based on the inherent equitable powers of the court as well as the court's purported power to award fees under 49 U.S.C. § 20(11). Attorney's fees are not available under 49 U.S.C. § 20(11) unless there is a recovery of damages sustained in consequence of a violation of the Interstate Commerce Act. *Atlanta Coast line Railroad v. Riverside Mills*, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 (1911). See *Reed v. Aaacon Auto Transport, Inc.*, 637 F.2d at 1308.

While the court is empowered to impose attorney's fees on equitable grounds, *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), this case is not an appropriate one for exercise of that power. *See Miller v. Aaacon Auto Transport, Inc.*, 447 F.Supp. 1201, 1207 (S.D.Fla.1978), *Caspe v. AAAcon Auto Transport, Inc.*, 658 F.2d 613 (8th Cir. 1981).

The motions for attorney's fees against Sims and Superior are DENIED.

## VI. OTHER MOTIONS

Based on all the foregoing the court concludes that it is not appropriate to assess punitive damages against the defendants. Plaintiff's motions for punitive damages are accordingly DENIED.

After careful consideration, the court concludes that Sims' motion for judgment notwithstanding the verdict must be DENIED. In arguing for its motion Sims once again raised the issue of the borrowed servant doctrine. In light of the evidence presented at trial, Sims did not conclusively establish that it met all the necessary elements of that doctrine. *See Charter Builders, Inc. v. Sims Crane Service, Inc.*, 150 Ga.App. 100, 102–103, 256 S.E.2d 678 (1979).

After careful consideration the court also concludes that Sims' motion for a new trial must be DENIED.

Finally, the parties at various points in their briefs referred to the possibility of evidentiary hearings on some of the pending motions. In light of the disposition of those motions reached here such hearings are unnecessary and the motions for such hearings are DENIED.